# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARTHA GURULE,

        Plaintiff,

v.                                                  No. CIV 01-722 MCALFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

Plaintiff Martha Gurule ("Gurule") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Gurule was not eligible for supplemental security income ("SSI"). Gurule moves this Court for an order reversing the Commissioner's final decision, or alternatively, to remand for a rehearing. [Doc. 10.]

Gurule was born on July 23, 1953 and was 45 years old when the administrative hearing was held. She has an 11th grade or "limited" education. [Tr. at 14.] She dropped out of high school after the 11th grade when she became pregnant. [Tr. at 322.] During the 1970's and 80's, her most consistent employment involved working as a waitress and a dancer in a bar. She has performed

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

some house sitting, and runs errands for people. Gurule did not perform these jobs on a full-time basis and her earnings did not rise to the level required for a presumptive finding of substantial gainful activity. Therefore, the Administrative Law Judge ("ALJ") concluded that Gurule had no past relevant work experience. [Tr. at 14.] Gurule also has not had a permanent residence for some time and apparently lives with different relatives. She has a grown son and receives food stamps.

On July 10, 1996, Gurule applied for disability benefits, alleging an onset date of June 1, 1995 due to a neck, back and shoulder injury, and cirrhosis of the liver.[2] [Doc. 11.] On August 2, 1995, she was involved in a motor vehicle accident that appeared to result in minor injuries although Gurule, through the assistance of an attorney, litigated the accident. [Tr. at 243.] On May 6, 1998, Gurule's social security attorney wrote the Social Security Administration stating that after interviewing Gurule and speaking with her case manager, the attorney believed that Gurule's psychological condition also "may be a pertinent part of her disability claim." [Tr. at 134.] Gurule's attorney requested a psychological exam including an assessment of her I.Q. In October 1998, Gurule was given a neuropsychological evaluation at the request of her primary care physician. [Tr. at 322.] In the ALJ's decision, Judge Carol Connor considered evidence of Gurule's alleged physical impairments along with her borderline intellectual functioning. [Tr. at 15.]

Gurule's application for SSI benefits was denied at the initial and reconsideration stages, and she sought timely review from the ALJ. An administrative hearing was held on November 6, 1998. In a decision, dated November 24, 1998, the ALJ found that Gurule was not disabled within the

---

[2]Gurule filed a prior disability benefit application in January 1995 that was denied in April 1995, and an even earlier application that apparently was denied in 1993. [Tr. at 338, 339.] Gurule claimed the alleged disability pertaining to the 1995 application was due to chronic liver disease and cirrhosis, along with lifting problems related to surgery on her right arm and side. [Tr. at 340, 342, 343, 347.] In the disability report for the 1995 application, Gurule stated that she got tired and could not find steady work. [Tr. at 347, 366.]

meaning of the Social Security Act ("the Act") and denied the benefit request. Gurule challenged this determination to the Appeals Council which denied her request for review on June 1, 2001. This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[3] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[4]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[5] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[6] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[7] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[8] If the claimant is successful at all four of

---

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[5]20 C.F.R. § 404.1520(b) (1999).

[6]20 C.F.R. § 404.1520(c) (1999).

[7]20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[8]20 C.F.R. § 404.1520(e) (1999).

the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[9] age, education and past work experience, she is capable of performing other work.[10] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[11]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (relying on Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). Non-exertional limitations can include mental impairments. The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable. Id. However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the

---

[9]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[10]20 C.F.R. § 404.1520(f) (1999).

[11]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

ability to work." Id. (internal citations omitted.) In this case, the ALJ conclusively used the grids in reaching her decision at step five of the analysis and did not utilize a vocational expert.

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Gurule's medical records, symptoms and complaints, the ALJ rejected Gurule's claim for SSI at step five, concluding that she had the RFC to perform "simple, unskilled work at the light level of exertion," that existed in significant numbers in the national economy. (Tr. at 19.) In reaching this decision, Judge Connor made the following findings before utilizing the Medical-Vocational Guidelines ("grids"): (1) Gurule had not engaged in substantial gainful activity since her filing date of October 10, 1997; (2) Gurule had "severe" impairments consisting of "fibromyalgia with chronic neck and low back pain and borderline intellectual functioning during times under review;" (3) her test results and/or complaints of rheumatoid arthritis, tendinitis of the right knee, headaches, cirrhosis and depression were not "severe" impairments; (4) Gurule's severe impairments (consisting of musculoskeletal impairments or mental retardation) "fall short of listings-level severity;" and (5) Gurule had the RFC to perform simple, unskilled work at a light level of exertion. [Tr. at 15-18.] Judge Connor also found that Gurule's testimony was not credible overall and that she had no past relevant work. [Tr. at 19.] At the fifth step of the sequential analysis, the ALJ applied the grids, without any vocational expert testimony, and decided that the grids directed a conclusion that Gurule was not disabled from a physical or strength perspective. Judge Connor also examined Social Security Ruling 85-15 in evaluating Gurule's mental impairments and concluded her "vocational factors" did not present barriers to the performance of simple, entry-level unskilled work. [Tr. at 19.] Thus, the ALJ determined that Gurule was not disabled since she could perform other work that existed in the national economy. [Tr. at 20.]

In this appeal, Gurule asserts that the case must be reversed and remanded for three reasons: (1) the ALJ's finding that Gurule's mental impairment did not meet a Listing was not supported by substantial evidence and was contrary to law; (2) Judge Connor's reliance on the grids as a

"framework" without using a vocational expert was contrary to law; and (3) the ALJ's credibility findings were not supported by substantial evidence and were contrary to law. [Doc. 11.] The Commissioner claims the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. 12.]

After a review of the entire record, this Court recommends, for the reasons set out below, that this case be remanded for further hearings and findings, consistent with this opinion.

## Summary of Gurule's History and Medical Care

The earliest medical records in the administrative record are from 1992 and 1993, but are unremarkable for purposes of determining this appeal. The administrative record does not contain any documentation of how Gurule did in school, which is pertinent, in this case, to the step three Listing inquiry. The psychologists who examined Gurule in 1998 found that she was a poor historian and was unable to provide a clear account of her performance in school. [Tr. at 322.]

Based on the medical records, it appears that Gurule visited UNM Hospital ("UNMH") rather regularly, beginning in 1994, for a variety of complaints and regular check-ups. [Tr. at 305, 374-378 380-381.] It also seems that on at least several occasions during 1994, medical personnel could not figure out the exact reasons for Gurule's visits, implying perhaps that Gurule was not communicating those reasons clearly. [Tr. at 374, 380.]

In January 1995, when she previously applied for SSI benefits, Gurule described the condition that kept her from working as being tired and not finding steady employment. [Tr. at 347.] At that time, she cleaned house, prepared meals, washed dishes, did the laundry, shopped for food, drove a car, read, watched TV, went to church, took walks, took care of her daily personal needs and did

some crossword puzzles. [Tr. at 367.] She stated that there was no change in her condition or activities except that she tried to look for work as hard as she could. [Tr. at 359.]

On August 2, 1995, she had an automobile accident that involved a car backing up and hitting the front of her car. [Tr. at 245.] She visited UNMH two days after the collision, complaining of headaches, neck and lower back pain. [Tr. at 163, 254.] She told UNMH staff that she wanted to sue her insurance company for pain and suffering and that she felt she could not work. [Tr. at 254.] Although she was told the x-rays were "negative," she subsequently consulted an attorney who referred her to a chiropractor. She was told she had a "pinched nerve in her neck." [Tr. at 245.] The UNMH record shows that (two days after the accident) she was walking easily without discomfort. UNMH medical personnel concluded that she had a "mild" cervical strain. They predicted that she should be back to full activity within five days after the accident. [Id.]

In November 1995, another UNMH records shows that Gurule was being followed by an attorney, chiropractor and physical therapist since the motor vehicle accident and that the chiropractor was requesting she be prescribed muscle relaxants. [Tr. at 197, 250.] In late 1995 and early 1996, she was being treated by Caremore chiropractor George Bashton ("Bashton"). He wrote a note, dated January 8, 1996, that based on testing, Gurule was unfit at that time to perform an average 8 hour day of work. Bashton noted that she could perform most functions on a limited basis. and concluded that Gurule was improving. She visited Caremore about 11 times in January and February 1996. [Tr. at 150-164.]

In 1996, Gurule received physical therapy at UNM. On June 25, 1996, one of the physical therapy progress notes shows that the motor vehicle accident occurred 1 ½ years ago and that she currently was in litigation over it. [Tr. at 243.] On October 9, 1996, Gurule was seen at UNM

Medical Center for myofascial pain that was improving slowly. [Tr. at 238.] Ten physical therapy treatments were recommended for Gurule on the same date related to myofascial pain. [Tr. at 298.] On December 16, 1996, she was seen at the UNM Medical Center and apparently was requesting to return to the pain clinic. The staff member reviewed her chart and noted that Gurule had been discharged from the Pain Center previously because she was "persistently non-compliant with home program . . ." [Tr. at 237.] Gurule told the staff member that she did exercise, and then described cleaning her car "in which she lives." [Id.]

In 1997, Gurule continued to complain of long term neck and back pain. A neck brace, however, was not medically indicated for her pain. [Tr. at 235.] On May 30, 1997, she visited UNMH for lab results related to her liver status, and the record shows that she did not seem to accept or understand that she needed to follow up with a primary care physician to obtain lab results. [Tr. at 233.] A July 11, 1997 UNMH record notes that it is unclear what she is there to "establish" since she sees a different doctor each time. She acknowledged that depression was a problem for her, and she was getting some help from Trazadone, an anti-depressant. [Tr. at 231.]

It appears that as of September 22, 1997, Gurule became a new patient of UNM physician Rick Pinon. [Tr. at 229.] On that date, Dr. Pinon wrote a note "to whom it may concern," that Gurule was currently being evaluated for neck and back pain and that it was best for her to work "light duty" types of jobs and to refrain from heavy lifting. [Tr. at 229.] There is no evidence at this point that Gurule held a job. Dr. Pinon's more detailed medical records are difficult to decipher. [Tr. at 226, 227.]

On October 8, 1997, Gurule had an ultrasound of her abdomen that appeared normal. [Tr. at 292.] On November 17, 1997, a cervical spine was performed that showed "some" loss of normal

lordotic curve.  Her alignment was normal, and she had "very mild disc space loss without significant degenerative changes."  [Tr. at 286.]

On December 4, 1997, Dr. Lenore Herrera performed an evaluation of Gurule for purposes of her SSI application.  Gurule told Dr. Herrera that she had a long history of alcohol abuse and was diagnosed with cirrhosis many years ago.  Gurule said she had quit drinking nine years ago and that her liver had stabilized.  [Tr. at 200.]  Gurule also described her automobile accident in 1995 and claimed that she was limited in most activities like prolonged sitting, standing or walking.  Dr. Herrera noted that Gurule was able to do those things during the examination without difficulty.  [Id.]  According to this medical record, Gurule had worked in a tortilla factory as "replacement help" and the job ended.  "She has never sought other employment."  [Id.]  She told Dr. Herrera that she had 12 years of education, did not graduate and did not obtain her GED.  Dr. Herrera's examination of Gurule revealed essentially normal ranges of motion, along with a steady and broad based gait that was "totally unassisted."  [Tr. at 201.]  Dr. Herrera's final diagnosis was that she had cirrhosis and was still in therapy for chronic problems with stiffness and pain, but that she had no functional deficits.  Dr. Herrera's also wrote:  "Non-work status for a prolonged period of time with limited education.  No high school diploma.  No job retraining skills."  [[Tr. at 202.]

The functional capacity assessment performed on December 12, 1997, showed Gurule had no functional limitations.  [Tr. at 213.]

On April 13, 1998, Gurule was referred to social worker Stacy Reid by Dr. Pinon.  [Tr. at 266.] Ms. Reid noted that Gurule lived with her boyfriend and her brother and that she suffered from chronic knee and back pain "secondary to accident she had four years ago at work."  "Patient feels

she cannot work; states she has requested services from division of vocational rehab, but 'they refused to help me.'" [Tr. at 266.]

On April 25, 1998, Gurule was given another physical residual functional capacity assessment. [Tr. at 306.] The reviewing physician noted the following exertional limitations: occasional lifting of no more than 50 pounds; frequent lifting of 25 pounds; standing, walking or sitting about 6 hours; and unlimited pushing and pulling. The physician also stated that the 1/98 lab was remarkable for positive rheumatoid factor, positive ANA. [Tr. at 307.]

On about June 9, 1998, Dr. Pinon wrote a referral for Gurule requesting a thorough psychological evaluation because of "questions regarding ability to hold, maintain employment. . . ." [Tr. at 330.] On August 11, 1998, Dr. Shah at UNM saw Gurule, apparently for the first and only time. He took down a detailed history of Gurule's complaints and diagnosed her with "fibromyalgia," "flexor tendinitis of the right knee." [Tr. at 328.]

On September 17, 1998, a neuropsychological evaluation was performed on Gurule "to determine her neurocognitive abilities and ability to hold a job." [Tr. at 322.] Two UNM Health Sciences neuropsychologists signed the evaluation. Gurule told the psychologists that she did not recall if she attended "resource classes" in school or if she was tested in school. She denied receiving any special education courses. She described learning in school as difficult and that there was a family history of mental retardation in a sister and nephew. The evaluation documents that her work history was sporadic, primarily consisting of waitress work and dancing at a bar. She was terminated as a maid and temporary factory worker because of "inefficient performance." [Tr. at 322.]

The evaluation records that Gurule started feeling depressed about a year prior to this examination and that she had passive suicide ideation. She acknowledged that she was referred to

a social worker and to counselors in the past but that she did not follow up with these referrals. She stated that she attempted to obtain services through the Department of Vocational Rehabilitation ("DVR") but had not followed through with appointments or procedures. The psychologists noted that she did not seem to have a clear understanding of what was required of her with respect to DVR services. [Tr. at 323.]

The evaluation also shows that Gurule was casually dressed for the appointment in a revealing manner. She often did not seem to understand what she was being asked and had difficulty understanding directions to tasks administered during the evaluation. She had to have questions repeated. Her performance on most tests was "slow and deliberate." During the evaluation, she took several short breaks to stand up or walk around due to pack pain. "Overall, the test results are considered to be an accurate and valid reflection of her current cognitive functioning." [Tr. at 323.]

Gurule was administered the Wechsler Adult Intelligence Scale test ("WAIS III") and other related tests. She received a score of 65 on verbal intellectual functioning, which was in the mentally retarded range, a 74 on nonverbal intellectual ability, which was in the borderline range, and a full scale IQ score that was in the mentally retarded range. [Tr. at 323.] Gurule's reading, spelling and mathematical abilities were estimated to be at the third and fourth grade levels, which were significantly lower than expected due to her reported level of education. However, the scores were consistent with her intellectual abilities as assessed by the WAIS-III.

Based on an interview with Gurule's mother, Gurule's adaptive behavior composite score was in the borderline range. In the "communication domain," she was not able to perform tasks such as writing a basic letter, addressing an envelope, or making realistic long-range goals and plans to achieve them. She could read books at a fourth grade level. She was able to prepare meals, look

after her health and care for her clothes, but could not earn or manager her own money, budget expenses or have a checking account.  She had difficulty being timely for work.  [Tr. at 323.]

She performed in the impaired range on tests of attention, processing speed, cognitive flexibility and organizational skills.  Her organizational abilities were severely impaired.  [Tr. at 324.] The neuropsychologists concluded that her overall intellectual abilities fell in the mildly mentally retarded range, her academic achievement was in the mentally retarded range, and her adaptive functioning was in the borderline range overall.  They recommended that Gurule receive social work assistance, with maximum assistance to complete any required paperwork, and that she receive assistance from the DVR.  The psychologists noted that she had "some basic abilities that should allow her to perform simple and repetitive job duties," but that she would need assistance in understanding what is required of her with respect to vocational rehab, etc.  [Tr. at 325.]

On October 26, 1998, Dr. Bailey (apparently with the Pain Clinic at University Hospital) wrote a note to the "ISD Office" asking that Gurule be considered for food stamps.  He stated:  "She is undergoing medical evaluation at this time and is unable to work."  [Tr. at 334.]  It is unclear when Dr. Bailey actually examined Gurule at this point, or if he did.

On November 6, 1998, an administrative law hearing was held, at which Gurule was represented by counsel.  According to the transcript, the hearing lasted five minutes.  [Tr. at 30, 43.] Gurule testified that she could read and write, but could not spell.  [Tr. at 31.]  Gurule discussed some of her physical problems and stated that she could "barely lift up a coffee pot."  [Tr. at 32.]  She admitted that her cirrhosis had stabilized and that she did not plan to start drinking again.  With respect to how she supported herself, she stated that she ran errands for people who needed help and she received food stamps.  She visited relatives and attended church.  In response to the ALJ's

question as to why she did not follow up with DVR, she seemed to have the impression that they could not help her unless she was receiving SSI. [Tr. at 39-40.]

After the administrative hearing, social worker Stacy Reid submitted a letter to Gurule's attorney stating that over the seven months Ms. Reid had known Gurule, she observed Gurule to have difficulty following through with recommendations and directions. [Tr. at 336, 337.] Prior to this letter, there appears to be only one set of notes by Ms. Reid in the administrative record.

Dr. Bailey apparently wrote a referral for Gurule, dated November 23, 1998 ("date of consultation") that was sent to the ALJ. The referral states that Gurule is to be evaluated by the pain clinic for further treatment. [Tr. at 335.] Again, there is no corresponding medical record regarding an actual examination of Gurule by Dr. Bailey. On December 28, 1998, there is another note apparently signed by Dr. Bailey stating that Gurule remains under his care and remains unable to work due to neck and back pain. [Tr. at 409.]

Almost a year later, on August 23, 1999, Dr. Bailey again wrote a note for Gurule stating she remained unable to work due to neck and back pain. [Tr. at 404.] On that same date, Dr. Bailey appeared to fill out and sign a "certificate of eligibility for parking placard" for Gurule, in which he stated that Gurule was disabled due to her neck, back, and arms. Dr. Bailey certified that the following statements were truthful: Gurule could not walk one hundred feet without stopping to rest; she suffered the loss, or the complete and total loss of use of both arms and foot; and that "this condition" is permanent. [Tr. at 405.]

**Discussion**

The Court first addresses Gurule's argument that the ALJ erred at step five in relying conclusively on the grids to determine that Gurule was not disabled and finds that this case should be remanded for further proceedings so that a vocational expert also may be consulted.

## I.   STEP FIVE ANALYSIS

The grids were developed to assist in the determination of social security disability claims and are:

> matrices of the four factors identified by Congress – physical ability, age, education, and work experience – and . . . rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy.  The grids thus may provide a shortcut in certain circumstances to determining whether a claimant can perform other work by obviating the need for a vocational expert's testimony.

Daniels v. Apfel, 154 F.3d 1129, 1132 (10th Cir. 1998) (internal citations omitted).  Conclusive application of the grids is only appropriate when these characteristics exactly fit a listing in the grids, Gossett v. Bowen, 862 F.2d 802, 806 (10th Cir. 1988), or where there are no significant nonexertional impairments present that reduce the potential occupational base of the grids.  Martinez v. Apfel, 17 F.Supp.2d 1188, 1193 (D. Colo. 1998) (citing Trimiar v. Sullivan, 966 F.2d 1326, 1332 (10th Cir. 1992)).  The Tenth Circuit has explained that:

> [a]n ALJ may not rely conclusively on the grids unless [she] finds (1) that the claimant has no significant nonexertional impairment, (2) that the claimant can do the full range of work at some RFC level on a daily basis, and (3) that the claimant can perform most of the jobs in that RFC level.

Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993) (internal citation omitted).

The grids consider only exertional or strength impairments.  Hargis v. Sullivan, 945 F.2d 1482, 1490 (10th Cir. 1991).  In contrast, where significant non-exertional impairments exist, such as mental impairments or pain, the ALJ should not apply the grids conclusively and may use the grids only as a framework to determine whether sufficient jobs remain within a claimant's range of RF C. Id. at1489; Gossett, 862 F.2d at 806.  Under circumstances where a claimant's ability to work at a certain RFC is limited by nonexertional impairments, the Commissioner must produce expert vocational testimony or other similar evidence.  Cruse v. U.S. Dept. of HHS, 49 F.3d 614, 619 (10th Cir. 1995).

In addition, where as here, there is evidence that a mental impairment possibly prevents a claimant from working, the Secretary must follow the procedure for evaluating mental impairments set out in § 20 C.F.R. 404.1520a and document this procedure accordingly.  Id. at 617.

> This procedure first requires the Secretary to determine the presence of absence of 'certain medical findings which have been found especially relevant to the ability to work,' sometimes referred to as the 'Part A' criteria. . . . The Secretary must then evaluate the degree of functional loss resulting from the impairment, using the 'Part B' criteria. . . . To record her conclusions, the Secretary then prepares a standard document called a Psychiatric Review Technique Form (PRT form) that tracks the listing requirements and evaluates the climant under the Part A and B criteria.  At the ALJ hearing level, the regulations allow the ALJ to complete the PRT form . . . and require the ALJ to attach the form to his or her written decision.

Id. (internal citations omitted).  The conclusions in the PRT form may not be determinative because "the record must contain substantial competent evidence to support the conclusions recorded on the PRT form."  Id.  In addition, if the ALJ fills out the form herself, she must "discuss in [the] opinion the evidence [she] considered in reaching the conclusions expressed on the form," and relate that evidence to the conclusions.  Id. at 617-18.

Here, at step two, Judge Connor decided that Gurule had "severe" impairments consisting of "fibromyalgia[12] with chronic neck and low back pain" and borderline intellectual functioning. [Tr. at 15.] The ALJ properly recognized that she must consider Gurule's non-exertional impairments and how they did or did not affect Gurule's RFC. [Tr. at 17, ¶ 5.] At step five of the analysis, ALJ Connor conclusively applied the grids, without use of expert vocational testimony, to determine that Gurule was not disabled.

## A.     Nonexertional impairment - borderline intellectual functioning

The Court is concerned with the ALJ's exclusive use of the grids as it related to Gurule's mental impairment. Judge Connor set out her reasoning regarding why Gurule's claimed disabling back impairment and/or related pain lacked credibility and the record supports the ALJ's finding. However, the decision is far from clear as to why the ALJ discounted the objective evidence of Gurule's retardation and mental impairment and how that impairment may have affected her ability to work. In her written decision, Judge Connor commented on Gurule's failure to follow up with DVR for assistance in obtaining a job. Yet, the neuropsychologists concluded that Gurule's intellectual functioning appeared to interfere with Gurule's understanding of what the DVR could offer her. At the hearing, the ALJ was disturbed with Gurule's failure to follow up with DVR but asked no questions regarding how Gurule's retardation and mental limitations might affect some of the specific duties associated with unskilled light work.

---

[12]Judge Connor's determination that Gurule had fibromyalgia and that it was a severe impairment is somewhat surprising in view of the administrative record where only one physician made that diagnosis. [Tr. at ]. Indeed, Judge Connor noted in her decision that no other doctor diagnosed Gurule with fibromyalgia. It also appears that the physician making that diagnosis examined Gurule on only one occasion.

### i.   *Use of Grids:*

In addition, the ALJ is precluded from absolute reliance on the grids unless she finds there is no significant nonexertional impairment, Gurule can do the full range of work unskilled light level on a daily basis, and Gurule can perform most of the jobs in that RFC level.  Judge Connor found that Gurule's "nonexertional restrictions [did] not significantly restrict or narrow the light occupational base of jobs" available, but the decision does not address whether Gurule could do the "full range" of such work on a daily basis or whether she could perform most of the jobs at that level.  "Absent a specific finding, supported by substantial evidence, that despite [her] non-exertional impairments, [the claimant] could perform a *full* range of sedentary work on a sustained basis, it was improper for the ALJ conclusively to apply the grids . . . ."  Channel v. Heckler, 747 F.2d 577, 582 (10th Cir. 1984) (emphasis in original).  Accordingly, this Court cannot conclude that substantial evidence supports a finding of no significant nonexertional impairments that might reduce the potential occupational base of the grids.

### ii.   *PRT Form:*

Moreover, the PRT form filled out by Judge Connor and attached to her opinion addresses only the depression which the ALJ did not find severe or credible.  The determination of credibility is specifically reserved to the fact finder, and this Court does not substitute its own judgment for that of the ALJ.  However, the PRT form makes no mention of Gurule's retardation and borderline intellectual functioning.  Even if the PRT form could be read to address Gurule's intellectual functioning impairment, Judge Connor did not discuss in her decision the evidence she considered in concluding that Gurule "never" had deficiencies in concentration or "never" had difficulties in

maintaining social functioning.  Nor did she explain why she discounted the neuropsychologists' findings to the contrary.

The neuropsychological examination showed problems in Gurule's ability to concentrate.  The examination also raised questions about Gurule's ability to understand instructions and questions. Gurule had to have questions repeated and performed tasks slowly and deliberately.  She can read and write only at a third or fourth grade level.  Her organizational skills are severely impaired.  She has trouble showing up for work on time, and cannot write a letter or address an envelope.  Gurule's communication skills are questionable, as shown in the neuropsychological examination and in some of the medical records.  She has an IQ in the mentally retarded range.  Although the psychologists concluded that Gurule has "some basic abilities that should allow her to perform simple and repetitive job duties," this is not a finding that she can perform a full range of unskilled light work or most jobs in that range.  Moreover, nothing in the psychologists' evaluation indicates that they did not find Gurule credible during the examination.  Instead, they concluded that the test results were an accurate and valid reflection of Gurule's current cognitive functioning.  [Tr. at 323.]

In <u>Cruse</u>, the Tenth Circuit found problems with an ALJ's analysis when the judge merely repeated his conclusions in the opinion from those on the PRT form and only generally discussed the evidence of the claimant's mental impairment.  <u>Cruse</u>, 49 F.3d at 618-19.  Here, Judge Connor did not discuss or repeat her conclusions set forth on the PRT form in the decision, nor did she specifically discuss how Gurule's mental impairment might affect her RFC.  She summarized some of the neuropsychologists' test results or findings but did not include a discussion of all the evidence. [Tr. at 18.]  While the ALJ is free to accept evidence found to be credible and to reject that which is not, it is improper to use only those portions of a doctor's report that are favorable to the ALJ's

decision and ignore unfavorable evidence.  Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir. 1984).

Judge Connor further states that there is no medical evidence in the record to contradict the

psychologists' conclusion that Gurule had some basic abilities to perform simple and repetitive job

duties.  [Id.]  However, the absence of evidence is not evidence that she was able to perform those

duties.  See Sullivan, 987 F.2d at 1491.

### iii.  *Social Security Ruling 85-15*

Judge Connor also relied on SSR 85-15 in concluding that Gurule's "vocational factors have

not and do not present barriers to the performance of simple, entry-level unskilled work . . . ."  [Tr.

at 19.]  Judge Connor correctly cited SSR 85-15 in stating that the final consideration is whether a

person can perform unskilled work when her only impairment is mental and not of listing severity.

However, the following statements in SSR 85-15 impose additional obligations on the ALJ:

> The basic mental demands of competitive, remunerative, unskilled
> work include the abilities (on a sustained basis) to understand, carry
> out, and remember simple instructions; to respond appropriately to
> supervision, coworkers, and usual work situations; and to deal with
> changes in a routine work setting.  A substantial loss of ability to meet
> any of these basic work-related activities would severely limit the
> potential occupational base.  This, in turn, would justify a finding of
> disability because even favorable age, education, or work experience
> will not offset such a severely limited occupational base.

Gurule's neuropsychological examination calls into question her abilities to understand, carry out, and

remember simple instructions or to respond appropriately to work situations.  Moreover, her

"limited" education and work history as dancer and waitress in a bar do not appear to be "favorable"

factors.  Thus, SSR 85-15 does not support a finding of non-disability here.

Because the Court concludes that the testimony of a vocational expert is necessary to provide

sufficient data in determining whether Gurule's limitations might impose on her ability to do unskilled,

light work, the case will be remanded for a re-hearing to allow a vocational expert to testify as to these matters. *See* Sullivan, 987 F.2d at 1491 (finding that ALJ should have called vocational expert to determine the effect of claimant's limitations on ability to work); Cruse, 49 F.3d at 619 (failure to ask vocational expert about effect of mental impairment on claimant's ability to perform jobs was error); Martinez, 17 F. Supp.2d at 1194 (testimony of vocational expert necessary for proper disposition of case).

Finally, the Court also is concerned with possible inconsistencies between the ALJ's findings at steps two and five. At step two, Judge Connor found that Gurule's borderline intellectual functioning was a "severe" impairment. At step five, she appeared to conclude that it was not a significant impairment. However, a finding at step two that an impairment is severe means that the impairment "significantly limits [the claimant's] ability to do basic work activities, i.e., 'the abilities and aptitudes necessary to do most jobs.'" Williams v. Bowen, 844 F.2d 748, 752 (10th Cir. 1988). At step five, the grids cannot be applied conclusively if a plaintiff, as may be the case here, has nonexertional limitations that significantly limit her "ability to perform the full range of work in a particular RFC" category on a sustained basis. Teter v. Heckler, 775 F.2d 1104, 1105 (10th Cir. 1985). To decide otherwise might result in inconsistencies. For example, if it is determined that the plaintiff has a severe mental impairment, it follows that she cannot perform a full range of work in a particular category. Tafoya v. Barnhart, CIV No. 01-489 BB/DJS (D.N.M. April 30, 2002) [Recommended Disposition, Doc. 12] This conflict is yet another reason why it was inappropriate to rely solely on the grids in this matter. *See* Burns v. Apfel, 145 F.3d 1345 at *3-4 (Table, Text in Westlaw), 1998 WL 278535 (10th Cir. June 1, 1998) (ALJ failed to explain how he arrived at step

two finding of severe impairment and then step five finding of insignificant impairment, other than to state he did not believe the claimant).

## B.     <u>Back/Neck Pain - Credibility Findings</u>

After a careful review of the medical records, Judge Connor determined that the objective medical evidence refuted Gurule's allegation that her back and neck problems or pain were disabling and also reflected adversely on her overall credibility. In reaching this conclusion, Judge Connor noted that Gurule's treating physician in 1997 released her to perform "light duty type of jobs" and that he did not rule out heavy jobs in the future. In addition, medical records or lack thereof seemed to indicate that Gurule failed to seek medical attention after referrals and did not always follow prescribed treatment for her back and neck problems. Moreover, Dr. Bailey's referrals and/or notes that Gurule was unable to work were unsupported by objective medical evidence and were discounted by the ALJ. [Tr. at 18.] Judge Connor concluded that Gurule's nonexertional restrictions did not significantly restrict or narrow the light occupational base of jobs that were available. [Tr. at 20.]

The Court will not second guess the ALJ's findings regarding Gurule's credibility, particularly as those findings related to Gurule's back problems and alleged pain. "Upon review, one should 'generally treat credibility determinations made by the ALJ as binding.'" <u>Martinez</u>, 17 F.Supp.2d at 1193 (*quoting* <u>Talley v. Sullivan</u>, 908 F.2d 585, 587 (10th Cir. 1990)). The Court agrees with Judge Connor's careful and thorough analysis on this point, and concludes that the objective medical evidence supports a finding that Gurule's complaints of pain are neither fully credible nor supported by the record. Therefore, the Court declines to find that those credibility findings were in error or unsupported by substantial evidence.

## II.    **STEP THREE ANALYSIS**

Gurule also argues that the ALJ committed error by not concluding that her mental impairment met or equaled a Listing at step three of the sequential evaluation.  If such a finding had been made, this would have ended the sequential analysis and entitled Gurule to SSI benefits without further inquiry.  Because this Court is remanding for a rehearing as to the step five analysis, the Court also directs the ALJ to attempt to develop the record further at step three.

Gurule specifically contends that she met the requirements of Listing 12.05C – mental retardation.  Section 12.05C provides that the required level of severity for mental retardation is met when a claimant demonstrates "[a] valid verbal, performance, or full scale I.Q. of 60 through 70[13] and a physical or other mental impairment imposing additional and significant work-related limitation of function."  In addition to these two requirements, introductory language of 12.05 states that "[m]ental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22)."

The Commissioner concedes that Gurule met the first two requirements of Listing 12.05C, i.e., that Gurule's lowest IQ score was between 60 and 70[14] and that Gurule had other severe impairments "which would fulfill the second requirement of Listing 12.05C."  [Doc. 12 at p. 3.]  Indeed, to satisfy the second prong of 12.05C, the Tenth Circuit only requires evidence that the "claimant suffers from a severe physical or other mental impairment, as defined at step two . . ., apart

---

[13]The IQ of the mentally retarded range is from 0-69, and the IQ of the borderline range is from 70-79. <u>Gant v. Sullivan</u>, 773 F. Supp. 376, 378 (S.D. Fla. 1991).

[14]Although the Commissioner states that Gurule's lowest score was 70, this is incorrect.  The objective medical evidence shows that Gurule's lowest score was 65.  [Tr. at 323.]  The Commissioner's cite to the transcript at page 283 does not support its assertion.

from the decreased intellectual function." Herring v. Apfel, 1998 WL 865763 at *6 (D. Kan. Nov. 16, 1998) (internal citation omitted).

Here, the only part of the 12.05C inquiry at issue is whether the ALJ properly found that the there was substantial evidence to support the conclusion that Gurule did not manifest the requisite mental retardation before the age of 22. [Tr. at 16.] The Tenth Circuit has not addressed this issue and in fact, not many courts have. The District of Kansas concluded, however, that a court should presume that a claimant's current IQ score represents her level of retardation before age 22. Herring, 1998 WL 865763 at * 4-5 (relying on McPeek v. Sec'y of HHS, 19 F.3d 19 (Table, Text in Westlaw) (6th Cir. Feb. 24, 1994)).

The Court in Ouellette v. Apfel, 2000 WL 1771122 at *3 (D. Me. Dec. 4, 2000) provided a summary of some of the circuit court decisions on this question. At least two of the five circuit courts to have addressed this matter before December 2000 held that "absent evidence to the contrary, a person's IQ and/or the condition of mental retardation is presumed to have been approximately constant throughout his/her life." Id. (citing Guzman v. Bowen, 801 F.2d 273, 275 (7th Cir. 1986); Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985); Luckey v. U.S. Dep't of HHS, 890 F.2d 666, 668-69 (4th Cir. 1989)). More recently, the Eleventh Circuit held that evidence of an IQ score of 60 to 70 and evidence of an additional mental or physical impairment requires a presumption that the mental impairment manifested before the age of 22. Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001). The Hodges Court noted that the 8th Circuit also recently concluded that mental retardation is not normally a condition that improves as an affected person ages. Id. (citing Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)). The Eleventh Circuit, in Hodges, remanded so that the Commissioner could present evidence of the claimant's daily life in the

attempt to rebut the presumption of mental impairment before the age of 22. Id. at 1269. The Court further explained that its decision did not shift the burden of proof which remained with the claimant at step three. Id. *But see* Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992) (claimant cannot be found disabled at step three, under 12.05C, if he fails to meet his burden of proving he was mentally retarded before age 22), *cert. denied*, 507 U.S. 924, 1135 S.Ct. 1294 (1993).

In this case, the Court was unable to locate any evidence in the record that might clearly indicate whether Gurule's serious mental impairment manifested itself before the age of 22, or whether she functioned at a higher level at one time. Gurule was a poor historian according to the neuropsychologists' report, and she did not recall much about her education, other than the fact that she did not receive special education. Her school grades are not part of the record. Her low IQ test results were contrary to her reported level of education, but there is no evidence in the record to suggest a trauma-induced change in her IQ. There is, however, significant evidence that Gurule had a history of heavy drinking although she presently states she has not been drinking for a number of years. The abuse of alcohol could well be a factor in determining whether Gurule's poor performance was linked to alcohol abuse an adult. *See* Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (commenting that an individual with a major addiction is going to show intellectual deficiency).

The Court remands for further inquiry into when Gurule's mental impairment manifested. It is not clear that substantial evidence supports the finding made by the ALJ as to the onset date of Gurule's mental impairment. Moreover, the majority of circuit courts to have addressed this question have applied a presumption that mental retardation remains constant throughout one's life.

**<u>Recommended Disposition</u>**

That Gurule's Motion to Reverse and Remand for Rehearing [doc. 10] be GRANTED and that the matter be remanded for proceedings consistent with the proposed findings.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge